UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES FILARDI, COURTNEY ANDERSEN, LISA BURMEISTER, KENNETH LEONARD, DOROTHY PETERSEN, STEPHANIE RANEY, IRENE NUNEZ, CONRADO MOREIRA, KIARA REED, NACOLE HOUSTON, MONIKA BENNETT, JASON JARRELL, ALISON BARNHILL, KIMBERLEE FERRIS, JEFFREY GOULD, MELISSA SWARINGEN-ORTON, MICHELLE RUBIANO, and COLEMAN STEPHENS on behalf of themselves and all others similarly situated,<br><br>   Plaintiffs,<br><br>   -against-<br><br>MID AMERICA PET FOOD LLC,<br><br>   Defendant. | Case No.: 23-cv-11170-NSR |

**DECLARATION OF JASON SULTZER IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT**

**I. INTRODUCTION**

 I, Jason P. Sultzer, submit this Declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, and affirm that the following is truthful and accurate:

 1. I am one of the attorneys principally responsible for the handling of this case. I am personally familiar with the facts set forth in this declaration. If called as a witness, I could and would competently testify to the matters stated herein.

 2. Attached as **Exhibit 1** is the Settlement Agreement with exhibits in this action.

 3. This proposed class action settlement would resolve the claims of purchasers of Defendant Mid America Pet Food LLC's ("Mid America" or "Defendant") pet food products

1

("Mid America Pet Food Products").

4.  Plaintiffs seek to represent a nationwide class of consumers who purchased the Mid America Pet Food Products. Plaintiffs' Counsel has substantial experience in prosecuting class actions and in particular actions that involve contamination of consumer products, including in this district. *See, e.g.*, *Swetz v. GSK Consumer Health, Inc.*, 7:20-cv-04731-NSR (S.D.N.Y.) (Roman, J.); *Kessler v. The Quaker Oats Co.* Case No: 24-cv-526-KMK (S.D.N.Y.); *Clinger v. Edgewell Personal Care Brands,* LLC, 3:21-cv-01040-JAM (D. Conn); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.); *Catalano v. Lyons Magnus, LLC*, Case No. 7:22-cv-06867) (S.D.N.Y.); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.); *Patora v. Colgate-Palmolive Co.*, No. 7:23-cv-01118-VB (S.D.N.Y.); *Pompilio v. Boar's Head Provisions Co. Inc.*, No. 7:24-cv-08220-PMH (S.D.N.Y.).

5.  On September 23, 2025, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement in this action and granted related relief. ECF No. 50 (Preliminary Approval Order). In that Order, the Court conditionally designated me and three other lawyers as Class Counsel for the Settlement Class. ECF No. 50 at ¶ 6. Those lawyers are: Jeffrey Goldenberg of Goldenberg Schneider, LPA, Charles Schaffer of Levin Sedran Berman, LLP, and Carlos F. Ramirez, of Reese LLP (collectively, Class Counsel"). *Id*.

6.  Per the terms of the Settlement Agreement, Defendant shall pay or cause to be paid the Settlement Fund in the amount of $5,500,000. *See* Ex. 1. Assuming the Court grants the Attorneys' Fees in the amount of $1,833,150, $35,000,00 in costs, Incentive Awards to the Class Representatives in the total amount of $95,000, and the estimated costs of the notice and administrative costs in the amount of $354,332.76, the estimated Available Settlement Funds will be $3,182,517.24 plus interest.

7.  The reaction to the Settlement has been overwhelmingly favorable.

8. Only two objections to the Settlement (ECF No. 54, Objection by Zef Spaci; ECF No. 55, Objection by Mike Sussman) have been filed, and zero requests for exclusion have been received by the Settlement Administrator.

9. As set forth in the accompanying Memorandum of Law in Support of Final Approval of the Class Action Settlement, the objectors lack standing to make their objection inasmuch as they cannot demonstrate that they purchased a Mid America Pet Food Product. In their objections, the objectors generally identified the products they purchased and the stores at which they purchased them, but did not provide adequate details that would allow their purchases to be verified. Nor did either objector provide any proof of purchase for any purchase of a Mid America Pet Food Product. This omission is particularly glaring in the case of Mr. Spaci (ECF No. 54), who alleges that he purchased Mid America Pet Food Products online, meaning that proof of purchase should be readily accessible. Notably, Mr. Spaci did provide specific dates and locations of his purchases on the claim form he submitted to the Claims Administrator. *See* Weisbrot Decl., Exhibit I. Specifically, on his claim form he indicated that on February 6, 2024 and March 13, 2024, he purchased 15-pound bags of Victor Super Premium Dog Food Select Grain Free Chicken Meal & Sweet Potato Recipe at the Tractor Supply Co. store in North Versailles, Pennsylvania. *See id.* As set forth in the accompanying declaration of Brandon McKay, however, that product was not sold at that store on those dates, nor indeed, at any other time during the Relevant Period. Given the fabricated nature of the purchase alleged on Mr. Spaci's claim form, as well as the other indicia of fraud associated with both Mr. Spaci and Mr. Sussman (set forth below and in the accompanying memorandum of law and declarations), the Court should disregard their unsupported representations that they purchased Mid America Pet Food Products (and thus have standing to object) and, given their clear lack of standing to object, prevent them from docketing an appeal of the Court's Final Approval Order.

3

10. Moreover, as set forth in the accompanying memorandum of law and declaration of Derek Burrows of Angeion Group, there are numerous indicia of fraud associated with the objectors, and the objections they assert are meritless and have been rejected by other courts, including very recently by Judge Karas in *Kessler v. The Quaker Oats Co.* Case No: 24-cv-526-KMK (S.D.N.Y.) (*See* ECF No. 72, Transcript of Final Approval Hearing).

11. In particular, Mr. Spaci's Fifth Objection takes issue with my firm's expenses resulting from a payment of $24,000 to a consultant/expert. That expense was incurred for testing approximately fifty (50) bags of Mid America products in order to estimate the Salmonella contamination rate. This testing was an invaluable factor in determining an appropriate classwide settlement, and thus securing a benefit for the Class.

12. Despite the highly suspect and fraudulent nature of the objections, Class Counsel nevertheless worked with Angeion to make every effort to assist Mr. Sussman, who claims to have been unable to make claims on behalf of an entity. Entities were able to make claims using the claim form provided by Angeion by simply entering the name of the business in the spaces on the claim form for "first name" and "last name." *See* Weisbrot Decl. ¶ 26. In fact, Class Counsel successfully submitted two test claims on behalf of businesses utilizing the original electronic claim form on the settlement website. Alternatively, entity owners could contact Angeion by phone or email, as indicated on the claim form for assistance in completing their claim. No entity owner, including Mr. Sussman, contacted the Settlement Administrator to state that they were unable to file a claim. *See id*. Nonetheless, in an effort to make entity claims easier, starting on January 21, 2026 Angeion posted a revised claim form on the website which included a line to list a business entity. Angeion also contacted Mr. Sussman directly by email requesting that he provide information about his business in order to facilitate an entity claim on his behalf. Mr. Sussman never responded to Angeion's request for information and attempt to help him file a claim. *See*

4

Declaration of Derek Burrows. at ¶ 31.

13. As a result of the robust Notice Program, to date, the Claim Administrator has received 47,775 Valid Claim forms (13,811 submissions claimed reimbursement for Pet Injuries, and 46,898 submissions claimed reimbursement Food Purchases).

14. . The claims period ends on February 5, 2026. Class Counsel will provide the Court with an update regarding the number of claims filed at the Final Approval Hearing on February 6, 2026.

15. Another significant factor supporting final approval is the social benefit for consumers and society as a whole. Because settlements like these require companies to pay millions of dollars that ultimately impacts profitability, it deters corporations from allowing potentially harmful product contaminations from entering the stream of commerce and encourages stricter testing protocols and to maintain cleaner facilities. Here, Plaintiffs obtained significant non-monetary relief. Specifically, after the first Action in the Litigation was filed, Defendant has represented to Plaintiffs that as a result of the Recalls and this litigation, Defendant implemented a number of food safety-related enhancements. Also, Mid America has represented, and Plaintiffs have confirmed, that the value of the business practice changes and process improvements is approximately $7 million, all of which are designed to avoid future product contamination.

II. **BACKGROUND, PROCEDURAL HISTORY, AND SETTLEMENT**

16. Before commencing the Litigation, Class Counsel discussed the case with dozens of potential named plaintiffs and extensively investigated and analyzed, among other things, Defendant's marketing campaign, the relevant FDA guidelines concerning labeling and advertising disclosure requirements for pet food products, FDA guidelines regarding the presence of *Salmonella* in pet food products, the scientific research concerning the dangers of *Salmenella* , and research regarding how Defendant should have known the Products contained or were at risk of containing

5

*Salmonella*. Class Counsel also conducted extensive testing of the Products to estimate the contamination rate.

17. On November 28, 2023, Plaintiffs Andersen and Burmeister filed a putative nationwide class action lawsuit against Mid America in the Eastern District of Texas, captioned *Andersen v. Mid-America Pet Food, L.L.C.*, No. 5:23-cv-00140 (E.D. Tex.) (the "*Andersen* Action") asserting claims for negligence, breach of express and implied warranties, fraudulent concealment, unjust enrichment, and violation of several state consumer protection laws.

18. That case was followed by *Jackson v. Mid-America Pet Food, L.L.C.*, No. 5:23-cv-00153 (E.D. Tex.) (the "*Jackson* Action"), and *Barnhill v. Mid-America Pet Food, L.L.C*, No. 5:24-cv-00046 (E.D. Tex.) (the "*Barnhill* Action"), each of which brought similar claims on behalf of a nationwide class and various state classes of consumers.

19. On December 22, 2023, Plaintiff Filardi filed the instant action, *Filardi v. Mid-America Pet Food, LLC*, No 7:23-cv-11170 (S.D.N.Y.) (the *Filardi* Action"), seeking to certify a class of New York purchasers of Mid America Pet Food and statutory damages for violation of New York General Business Law sections 349 and 350.

20. On, January 25, 2024, the *Andersen*, *Jackson*, and *Barnhill* Actions (the "Texas Actions") were consolidated before Judge Robert W. Schroeder, III of U.S. District Court for the Eastern District of Texas, and on February 15, 2024, Plaintiffs filed a consolidated class action complaint in the *Andersen* Action.

21. On April 19, 2024, this Court, and the Court in the *Andersen* Action entered orders staying the litigations pending a decision on Defendant's anticipated motion to dismiss in the *Andersen* Action and the mediation between the Parties.

22. Class Counsel took it upon themselves to self-organize and coordinate the actions so that all the cases would proceed before this Court, eliminating duplication for the parties and the

Courts and limiting the expense to both sides. This coordination also avoided a potentially lengthy leadership fight among counsel for Plaintiffs in the four actions.

23.     Class Counsel worked together to thoroughly analyze the legal landscape, including conducting research into the various state consumer protection laws and available remedies, Article III standing, preemption and evaluating matters relating to class certification, in order to fully evaluate the risks and benefits to a potential early resolution.

24.     Indeed, Class Counsel worked cooperatively to coordinate the Litigation and to save judicial time and resources to consolidate the multiple similar litigations without a protracted battle for lead counsel and to lead the case to mediation and an early resolution.

25.     Based on the Parties' exchange of information to date and their respective investigations into the claims and defenses asserted in the actions, the Parties agreed to proceed to private mediation with the Honorable Diane Welsh (Ret.). In advance of the mediation, the Parties exchanged discovery relevant to their claims and defenses. This included discovery related to Plaintiffs' claims, including extensive sales, distribution and marketing information regarding the Mid America Pet Food Products, and the technical scientific information pertaining to the manufacturing process and suppliers regarding the sources and reasons for the potential Salmonella contamination, as well as the protocols put in place by Defendant to reduce the risk of any future potential contamination. This is largely the same information that would have been produced had the case proceeded to formal discovery. Accordingly, the Parties were sufficiently informed at the time of the mediation of the strengths and weaknesses of their respective positions, the size of the putative class, and the potential damages at issue to negotiate a reasonable settlement.

26.     In addition, Class Counsel conducted significant legal research and an investigation into industry reports, scientific literature, and the Mid America Pet Food Products' market segment as follows:

    a. Class Counsel thoroughly analyzed the legal landscape and evaluated the risks and benefits of prosecuting the Litigation and an early resolution, including research into the various state consumer protection laws and available remedies, and evaluating class certification issues.

    b. Class Counsel extensively analyzed the claims alleged in the complaints, Defendant's advertising campaigns, the relevant regulations and guidelines concerning labeling and advertising disclosure requirements for consumer products such as the contaminated products, regulations and guidelines regarding the presence of hazardous and dangerous substances such as bacteria in consumer products, the scientific research and literature concerning the dangers of bacteria (including *Salmonella*), and research regarding how Defendant could have known the Products contained or were at risk of containing bacteria.

    c. Class Counsel investigated and consulted with industry experts regarding inter alia the presence of bacteria in pet food products, regulations governing bacteria in these products, potential sources and elimination of that source of bacteria, and testing and screening for bacteria.

    d. Class Counsel analyzed the chain of distribution of the Mid America Pet Food Products and pricing per unit to help support and determine Plaintiffs' damages model, as well as the exact scope of the recall.

    e. Class Counsel investigated and consulted with experts regarding damages models for consumers purchasing an adulterated and or misbranded product contaminated with bacteria.

    f. Class Counsel conducted research into the market segment related to the Mid America Pet Food Products to understand the potential scope of this matter, economic losses to Class Members, and marketing and sales trends, practices, and patterns.

27. Class Counsel also conducted testing of the products to determine the scope of potential contamination

28. On August 12, 2024, the Parties attended a full-day mediation with Judge Welsh.

29. With Judge Welsh's assistance, the Parties reached a non-reversionary common fund settlement-in-principle. However, the Parties continued to pursue settlement discussions for several months, working out the details of the Settlement.

30. Before and during these settlement discussions and mediation, the Parties had arm's-length exchange of sufficient information to permit Plaintiffs and their counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

31. The Parties did not discuss Attorneys' Fees and Costs or any potential Incentive Award until they first agreed on the substantive terms of this Settlement.

32. On September 10, 2024 following the mediation, the Parties informed the Court that they had reached a resolution and requested permission to lift the stay and file a consolidated amended complaint and a motion for preliminary approval, which the Court granted. (Dkts. 14 & 15). On the same day, Plaintiffs filed a consolidated amended complaint in the Filardi Action to implement the settlement. (Dkt. 16). On September 26, 2024, the Court entered a Stipulation and Order staying the case pending final approval of the Settlement. (Dkt. 22)

33. On or about November 14, 2024, the Parties executed the Settlement Agreement, and Plaintiffs moved for preliminary approval of the class action settlement on November 20, 2024. (ECF No. 43).

34. With respect to selecting a settlement administrator, before selecting Angeion, Plaintiffs sought multiple bids from claims administrators and interviewed and vetted Angeion and its proposed notice plan for this settlement.

35. Plaintiffs selected Angeion based on its reputation for excellent work and breadth of experience administering other similar consumer class actions and the state-of-the-art fraud detection system (an issue that has become more prevalent in the digital age). For example, Angeion has administered very similar settlements regarding contamination of consumer products. *See Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.); *Catalano v. Lyons Magnus*, LLC, No. 7:22-cv-06867) (S.D.N.Y.); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.); *Patora v. Colgate-Palmolive Co.*, No. 7:23-cv-01118-VB (S.D.N.Y.). *See also In re Novartis*, 2024 U.S. Dist. LEXIS 132677, *15 (S.D.N.Y. Jul. 26, 2024) (finding that "Angeion's fraud detection system is robust and appropriately designed to weed out fraudulent claims."). Class Counsel has reviewed Angeion's fraud detection process and has been in constant contact with

9

Angeion throughout the claims process and is fully confident that Angeion's process is thoughtfully designed to reduce false positives and is necessary to protect the Class.

36. On September 23, 2025, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement, Preliminary Certification of Settlement Class and Approval of Notice Plan and scheduled a Final Approval hearing for February 6, 2026 (ECF No. 50).

### III.    SUMMARY OF SETTLEMENT BENEFITS AND RISKS OF CONTINUED LITIGATION

37. As stated above, Class Counsel has substantial experience in prosecuting class actions of a similar size, scope, and complexity, and in particular actions that involve contamination of consumer products. *See, e.g. Kessler v. The Quaker Oats Co*. Case No: 24-cv-526-KMK (S.D.N.Y.); *Clinger v. Edgewell Personal Care Brands,* LLC, 3:21-cv-01040-JAM (D. Conn); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.); *Catalano v. Lyons Magnus, LLC*, Case No. 7:22-cv-06867) (S.D.N.Y.); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.); *Patora v. Colgate-Palmolive Co*., No. 7:23-cv-01118-VB (S.D.N.Y.); *Pompilio v. Boar's Head Provisions Co. Inc*., No. 7:24-cv-08220-PMH (S.D.N.Y.).

38. Class Counsel has made $5.5 million in valuable benefits available to Class Members which will be exhausted to pay all Approved Claims, as well as any attorneys' Fee Award, Service Awards, and Notice and Other Administrative Costs that the Court approves. Ex. 1, Settlement Agreement, § I, ¶31. Settlement Class Members shall be eligible to receive monetary relief from the Settlement Fund by submitting a Valid Claim Form. SA § V, ¶1. Settlement Class Members shall have the opportunity to submit a Pet Injury Claim and/or a Food Purchase Claim. *Id*. Settlement Class Members may submit both a Pet Injury Claim and a Food Purchase Claim. *Id*. Settlement Class Members submitting documented Pet Injury Claims are eligible to recover related costs, such as costs for veterinarian care, treatment, screening, burial or cremation costs, or costs

10

for a new pet. SA § V, ¶6. Valid Undocumented Pet Injury Claims will be paid at a capped amount as required by the Plan of Allocation (no more than $50 for an injured pet and no more than $100 for a deceased pet). SA § V, ¶7.

39. Settlement Class Members who submit a valid Consumer Food Purchase Claim with supporting documentation will be compensated 100% of approved submitted losses (e.g., receipts, invoices, shipping order forms, confirmation emails, proof of payment, etc. showing the purchase price paid for the Mid America Pet Food Products). SA § V, ¶10. Settlement Class Members who submit a valid Consumer Food Purchase Claim without Proof of Purchase will be limited to $20 for each bag of Mid-America Pet Food Product purchased, subject to a two-bag maximum. SA § V, ¶11.

40. Subject to the $1.5 million set aside from the Settlement Fund to be used exclusively to pay valid documented Pet Injury Claims and valid Documented Food Purchase Claims, see SA § V, ¶ 12(a), if the total sum payment amount of all Valid Claim Forms exceeds the amount available in the Net Settlement Fund (as defined in SA § I, ¶ 20), then each eligible Settlement Class Member shall have their payment reduced on a pro rata basis. SA § V, ¶ 12(b). Conversely, if the total proposed payment for all Valid Claims Forms does not exceed the amount available in the Net Settlement Fund, then those excess funds shall be paid pro rata to each claimant who submitted a Valid Claim Form. SA § V, ¶ 12(c). No settlement funds will revert to Defendant.

41. The Settlement achieved by Class Counsel benefits individual Settlement Class Members who submitted claims in a number of ways. First, the Settlement puts money directly in their pockets.

42. Second, the Settlement benefits the entire Settlement Class as a whole, whether Settlement Class Members submitted a claim or not, because it provides for a high percentage of the total possible recovery in this litigation in the event the case was successfully tried to conclusion.

Considering the additional, non-monetary relief ($7 million worth of business practice changes and capital improvements to its production and food safety programs), the combined financial benefits from this settlement are approximately $12.5 million,

43. Plaintiffs estimate that the total sales of the Products that are the subject of the litigation and which are potentially contaminated and potentially reached consumers' hands during the relevant time period is approximately $45 million (using a 1% contamination rate, which is higher than the actual contamination rate based on Plaintiffs' own testing). The $5.5 million recovery for the Class under the settlement represents approximately 12.2% of Defendant's potential liability under a total disgorgement theory.[1] This alone is a very significant recovery, especially considering the difficulty in successfully litigating these types of cases, the risks of losing before or at trial, and how efficiently this Settlement was achieved.

44. The full disgorgement theory would have been challenged by Defendant at trial and may not have succeeded, as Defendant likely would argue that even potentially contaminated products are not completely worthless. As a result, Plaintiffs' damage model may have been limited to the premium class members paid over what they would have paid had they known about the contamination or risk of contamination. This kind of "price-premium" damages analysis is widely accepted in consumer deception cases in this Circuit.

45. Based on Class Counsel's experience in these kinds of consumer product contamination cases, as well as discussions with an economic expert who frequently uses conjoint analysis to calculate damages in similar cases, the best-case, price-premium scenario for products like this is generally around 30% of the purchase price. Here, the Settlement Class's best day under a 30% price premium model would be $15 million dollars, and the $5,500,000 Common Fund provides 36.6% of this value. Thus, the class here is recovering somewhere between approximately

---

[1] This percentage was calculated using the $5.5 million common fund. Using the $12.5 million in total benefits as a baseline, the Settlement represents approximately 27.7% of total disgorgement damages in this case.

12

12.2% of what it might have recovered at trial (full disgorgement) and 36.6% of the price premium.[2] Even on the low end, this is a significant recovery.

46. The Settlement Agreement mitigates risks and costs by providing an immediate and certain substantial monetary recovery and alleviates the risk of continued litigation.

47. While Plaintiffs believed in the viability of their claims, Defendant's anticipated defenses posed a significant risk that the case would be dismissed and Plaintiffs and the Settlement Class would receive nothing. The next steps in the litigation would have been resolution by the Court of Defendant's anticipated motion to dismiss, Plaintiffs' forthcoming motion for class certification, and Defendant's forthcoming motion for summary judgment. At minimum, these efforts would be costly and time-consuming for the Parties and the Court, and create the risk that a litigation class would not be certified and/or that the Settlement Class Members would recover nothing at all.

48. Further, Defendant is represented by one of the largest and best defense firms in the country, which is well-versed in class action litigation, and Defendant has indicated that it would continue to assert numerous defenses on the merits.

49. If litigation proceeds, Defendant's arguments could completely defeat, or significantly narrow, the scope of the Litigation, claims, and damages through, *inter alia*, successful dispositive motions or opposition to class certification.

50. In addition, if the litigation proceeded to trial, both sides would offer expert testimony on liability and damages.

51. Plaintiffs would undoubtedly face a challenge to their class-wide damages expert who would proffer a methodology for calculating aggregate class-wide economic injury. Such an expert undertaking is costly, and Plaintiff expects Defendant would challenge Plaintiffs' ability to

---

[2] Using the total value of the Settlement (including $7 million in value created by changes to Defendant's business practices), the Settlement represents 83.3% of the total potential damages if adopting the price premium damage model.

calculate a price premium class wide.

52. Plaintiffs acknowledge the complexity in the resolution of whether advertising claims deceive reasonable consumers. A rigorous battle of the experts would include survey analyses and disputed damages analyses.

53. There is a substantial risk that a jury may accept Defendant's experts' testimony and damages arguments or award far less than the settlement amount or nothing at all.

54. While confident in their claims, Plaintiffs nonetheless face significant risks in establishing liability.

55. If litigation continues, Plaintiffs and Class Counsel are also aware that Defendant would oppose class certification vigorously, and that Defendant would prepare a competent defense at trial. And while Plaintiffs and Class Counsel were confident in the claims alleged, it is entirely possible that the Court could have sided with Defendant, leaving Plaintiffs and Settlement Class Members empty-handed.

56. The outcome of these proceedings cannot be certain, and if the litigation proceeds to trial, it will be a lengthy and complex affair with appeals likely to follow.

57. Consistent with Seventh Circuit jurisprudence, in settling the litigation, Plaintiffs accounted for the estimated damages, the benefits and risks of continuing litigation against Defendant, and the range of possible outcomes should the litigation continue.

58. The Settlement also will provide an immediate and certain benefit to the Settlement Class and will avoid the substantial burdens and costs that continued and uncertain litigation would impose on the parties, non-party witnesses, and the courts. Furthermore, there are many steps between here and any potential verdict.

59. Even assuming arguendo, that continued litigation might result in a larger recovery than the settlement, it would occur only after the expenditure of hundreds of thousands of dollars in

costs and expenses (at best) that would eat up much of any increased recovery.

60. Millions of dollars worth of potentially contaminated Mid America Pet Food Products were sold during the relevant time period. Clearly, the class consists of at least hundreds of thousands of consumers who purchased the Mid America Pet Food Products.

61. Here, the reaction of the Settlement Class Members to the Settlement has been overwhelmingly positive. Class Notice has been provided to the Settlement Class Members in accordance with the requirements of Rule 23(c)(2)(B) and the Preliminary Approval Order. Only two Settlement Class Member objected to the Settlement (for the reasons set forth herein and in in the accompanying memorandum of law and declarations, those objections are meritless and the objectors lack standing), and zero submitted valid opt outs.

62. Even if Plaintiffs could have defeated a motion to dismiss, obtained a class certification order and proceeded to trial, victory before the trier of fact would have been uncertain. Such uncertainty, moreover, was compounded by the appeals virtually certain to have followed any verdict. In short, while Class Counsel believes that the claims are viable and strong, there can be no denying the array of serious class-wide risks, any one of which could have precluded the Class and its counsel from recovering anything at all.

63. By any standard, this Settlement constitutes a favorable result made possible by the dedication and skill of Class Counsel under very difficult circumstances.

64. Moreover, Class Counsel are qualified, experienced, and generally able to conduct the Litigation. Class Counsel have invested considerable time and resources into the prosecution of the Litigation and possess a long and proven track record of the successful prosecution of class actions, including false advertising cases, and numerous appointments as class counsel

65. No other agreements between the Parties exist other than the Settlement Agreement.

66. The Settlement Agreement is annexed hereto as Exhibit 1.

67. The Declaration of Steven Weisbrot is annexed hereto as Exhibit 2.

68. The Declaration of Derek Burrows in annexed hereto as Exhibit 3.

69. The Declaration of Brandon McKay is annexed hereto as Exhibit 4.

70. Class Counsels' firm resumes can be found at ECF No. 45-2.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of January, 2026 in Poughkeepsie, New York.

/s/ Jason Sultzer
Jason Sultzer